## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRATUITY SOLUTIONS, LLC and GRATUITY, LLC <br><br>                         Plaintiffs, <br><br>     v. <br><br> TOAST, INC <br><br>                         Defendant. | **Civil Action No. _____** <br><br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT AND BREACH OF CONTRACT**

Plaintiffs Gratuity Solutions, LLC and Gratuity, LLC (collectively "GS", "Gratuity Solutions" or "Plaintiffs"), for their Complaint against Defendant Toast, Inc. (referred to herein as "Toast" or "Defendant"), alleges the following:

### NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*, and for breach of contract under M.G.L.A. 260 § 2.

### THE PARTIES

2.   Plaintiff GRATUITY SOLUTIONS, LLC is a limited liability company organized under the laws of the State of Florida with a place of business at 3520 Kraft Road, Suite 200 NAPLES, FL 34105.

3.   Plaintiff Gratuity, LLC is a limited liability company organized under the laws of the State of Florida with a place of business at 3520 Kraft Road, Suite 200 Naples, FL 34105.

4.   Upon information and belief, Toast, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business at 401 Park Drive, Suite 801, Boston, MA 02215.

5.   Upon information and belief, Toast sells, offers to sell, and/or uses products and services throughout the United States, including in this judicial district, and introduces infringing products and services into the stream of commerce knowing that they would be sold and/or used in this judicial district and elsewhere in the United States.

## JURISDICTION AND VENUE

6.   This is an action including claims for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code and breach of contract under M.G.L.A. 260 § 2.

7.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367

9.   Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

10.   Defendant Toast is subject to this Court's general personal jurisdiction at least because Toast is a resident of Massachusetts as defined by Massachusetts law.  On information and belief, Toast is headquartered in Massachusetts.

11.   This Court has personal jurisdiction over Toast under the laws of the Commonwealth of Massachusetts, due at least to their substantial business in Massachusetts and in this judicial district, directly or through intermediaries, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct and/or deriving substantial revenue from goods and services provided to individuals in the Commonwealth of Massachusetts. Venue is also proper in this district because Toast has a regular and established place of business in this district.  For instance, Toast has its primary headquarters located in this judicial district.  (*See, e.g.*, https://pos.toasttab.com/. Accessed 7/26/2022).

## BACKGROUND

### The Invention

12.     Aleksandar Stepanovich is the inventor of U.S. Patent Nos. 9,741,050 and 10,726,436 ("the '050 patent" and "the '436 patent" respectively, collectively "The Asserted Patents"). Both are titled "System and Method for Managing Gratuities," and the '436 patent is a continuation of the '050 patent.  Both claim priority to the same provisional application filed on September 4, 2012.  True and correct copies of the Asserted patents are attached as Exhibit 1 and Exhibit 2 respectively.

13.     The Asserted Patents resulted from the pioneering efforts of Mr. Aleksandar Stepanovich (hereinafter "the Inventor") in the area of computer performance enhancement software for hospitality management.  These efforts resulted in the development of a method and apparatuses for managing gratuities.  At the time of these pioneering efforts, the most widely implemented technologies used to address the tracking, management, and distribution of gratuities often required interfacing with various computer systems, such as credit-card processing and point-of-sale systems, as well as digital or manual employee time and attendance systems.

14.     Mr. Stepanovich developed technology to allow disparate computer and business systems to function in a coordinated manner, while integrating them with newer technology, to offer previously impossible schemes for streamlined electronic gratuity distribution and payments. He went on to co-found Gratuity Solutions, LLC and Gratuity, LLC to develop, commercialize, and sell this software to hospitality businesses throughout the United States. To date, GS has over fifty employees and services thousands of businesses.

15.     In previous types of systems, restaurant managers had to manually collect and integrate the hours worked and sales data for their tipped employees to calculate the proper

distribution of tips in order to deal with the ever-growing and changing complexity of gratuity distribution rules and labor regulations.  Many hospitality managers utilized various software solutions to try to ensure that all employees were tipped out fairly and efficiently. Relevant data was spread across spreadsheets, timecards, time keeping systems, point-of-sale systems, accounting software, and payroll software.  No system was capable of collecting and manipulating this data into a single cohesive set, which could then be quickly and efficiently manipulated to determine payroll for the various employees.  Time lost making these calculations at the end of the night or the pay period was extensive, as was time spent adjusting faulty calculations, leading to employee dissatisfaction and difficulties in retention and morale.

16.     The Inventor conceived of the inventions claimed in the Asserted Patents to enhance the performance of tipped-employee business computer systems by enabling them to aggregate and compile tipped transaction and employee performance data and automatically apply pre-defined distribution rules to manage payroll.

17.     For example, the Inventor developed the Gratsync, GratShare and Payday Portal platforms to embody the patented technology, offering businesses with tipped employees the ability to connect their payroll systems to their point-of-sale systems and employee time and attendance systems, regardless of the platform.  These interconnected platforms are then used to calculate and distribute tips and other wages based on preprogramed distribution rules.

**Advantages Over the Prior Art**

18.     The patented invention disclosed in the Asserted Patents provides many advantages over the prior art, and particularly enhanced the operations of point-of-sale systems, employee-time-and-attendance systems, and payroll systems.  (*See* '436 patent at 1:19-2:65.)

19.     Another advantage of the patented invention is its ability to integrate with and add new and novel functionality to pre-existing systems and hardware, enabling them to perform gratuity distribution calculations without additional on-site hardware. The necessary calculations are performed on remote servers using data received from local systems. (*See* '050 patent at 3:4-3:23.)

20.     Because of these significant advantages that can be achieved using the patented invention, GS believes that the Asserted Patents present significant commercial value for companies like Toast.  Indeed, Toast has begun to emulate the features of GS's patents in its own products.

**Technological Innovation**

21.     The patented invention disclosed in the Asserted Patents resolves technical problems related to gratuity management and distribution, particularly problems related to the utilization of multiple disparate hospitality computer systems to perform gratuity calculations. As the Asserted Patents explain, one of the limitations of the prior art–as regards the management and distribution of gratuities–was that information could not be easily consolidated from disparate business systems and incorporated into one centralized processing system that could automatically and efficiently calculate tip distributions.  (*See* '050 patent at 1:18-1:44.)

22.     Tip pooling and tip sharing between various employees with different roles, working hours, tip pools, and tip distribution rules is extremely time-consuming and requires information from multiple systems, some manual and some electronic.  As many service establishments grow, they often lack the ability to scale properly and must abandon end-of-shift tip distribution, making it difficult to retain employees.

23.     The claims of the Asserted Patents recite inventive concepts that are rooted in engineering technology and overcome problems specifically arising out of how to handle disparate flows of information from independent software system, to efficiently calculate complex gratuity distributions in a service-business environment.

24.     Moreover, the claims of the Asserted Patents recite inventive concepts that are not merely routine or conventional uses of hospitality business systems.  Instead, the patented invention disclosed in the Asserted Patents provides a new and novel solution to specific problems related to improving electronic point-of-sale and payroll system integration and their efficient use of data to perform automatic calculations.

25.     The invention claimed in the Asserted Patents do not preempt all the ways that gratuity management systems may be used to improve the performance of service-business or hospitality computer systems, nor do the Asserted Patents preempt any other well-known or prior art technology.

26.     Accordingly, the claims in the Asserted Patents recite a combination of elements sufficient to ensure that the claim in substance and in practice amounts to significantly more than a patent-ineligible abstract idea.

### History of Communications and Business Between Plaintiff and Defendant

27.     Plaintiff and Defendant began their partnership and business interactions on or about August 2016 when Plaintiffs approached Toast to discuss building a solution to enable Toast Point-of-Sale customers to utilize the GS platform for gratuity distribution. Plaintiffs were put in touch with Ming-Tai Huh, who at the time was over Toast's partnerships and products.

28.     Plaintiff and Defendant entered into their first Non-Disclosure Agreement ("2016 NDA"), which was drafted by Defendant and signed by Mr. Huh, on or about August 29, 2016.

The A true and correct copy of this agreement is attached as Exhibit 3.

29.    Defendant knew or should have known of the Plaintiff's pending patent applications as extensive

30.    Defendant knew or should have known of the issuance of the Plaintiff's patents, due to the Plaintiff disclosure and disclaimer on its website, marketing materials and contract forms.

31.    From 2016 through the date of this filing Toast lists GS as an "Integration Partner" on their website and consistently refers customers and clients to Plaintiff, Gratuity Solutions.

32.    In late 2019, a business broker approached Toast on behalf of GS to ask whether Toast would be interested in discussing acquiring GS. Mr. Matthew Baumgartner, Toast's Principal of Corporate Development and Strategy indicated that Toast would be interested and sent over a second NDA agreement ("2019 NDA") for both parties as part of discussions related to merger or acquisition of GS by Toast. A true and correct copy of this agreement is attached as Exhibit 4. During the course of these negotiations, the existence of and subject matter of GS's patents and pending applications was further disclosed to Toast.

33. After a January 14th, 2020 call to discuss the possibility of acquiring GS, Mr. Baumgartner emailed the business broker to indicate that Toast would not be moving forward with acquiring GS, stating: "Right now we won't be able to go further in the M&A process but are excited to grow in our partnership with the team."

34.    Since at least 2016, Toast was aware of the function and capabilities of GS's software as it was advertised as an integrated product on Toast's platform. Further, Toast was aware that the GS software and its functions were protected by patent. Additionally, GS

conspicuously marked its website and other materials with its patent numbers, providing constructive notice of its patent protections.

35.     On September 1st, 2021, Plaintiffs reached out to Toast's General Counsel Brian Elworthy, CEO Chris Comparato, and integrations lead Mr. Ming-Tai Huh to update them on GS's performance and the existence of Plaintiffs newly issued '436 patent and to invite them to reengage in merger and acquisition discussions. No response to this email was received.

36.     On or around November 16, 2021, Toast announced its own gratuity management solution entitled "Toast Tips Manager."

37.     On June 6th, 2022 GS sent Toast a formal notice letter for its infringement of U.S. Patent Nos. 10,276,436 and 9,741,050.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 9,741,050

38. The allegations set forth in the foregoing paragraphs 1 through 37 are incorporated into this First Claim for Relief.

39.     On August 22, 2017, the '050 patent was duly and legally issued by the United States Patent and Trademark Office under the title "Systems and Method for Managing Gratuities."

40.     GS is the assignees and owner of the right, title and interest in and to the '050 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

41.     Upon information and belief, Toast has and continues to directly infringe one or more claims of the '050 patent by selling, offering to sell, making, using, and/or providing and causing to be used products, specifically the Toast Tips Manager which by way of example includes https://central.toasttab.com/s/article/Toast-Tips-Manager-Guide (last accessed September 19, 2022) (the "Accused Instrumentality").

42.     Exemplary infringement analysis showing infringement of claim 1 of the '050 patent is set forth in Exhibit 5.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Toast with respect to the '050 patent.  GS reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '050 patent.

43.     The Accused Instrumentality infringed and continues to infringe at least claim 1 of the '050 patent during the pendency of the '050 patent.

44.     On information and belief, Defendant has been aware of the existence of Plaintiff's patented invention since at least discussions between Plaintiffs and Defendants in or around November of 2019 regarding the acquisition of Plaintiff's business. During those discussions, an executive summary was furnished to Defendants providing the patent number for the '050 patent and outlining the functions involved in the patented invention, which was and is embodied in Plaintiff's propriety patented software.

45.     Furthermore, Defendant was well acquainted with the operation of Plaintiff's patented software as they advertised Plaintiff's software on their website as an "integration partner" with the Toast platform.  Gratuity Solutions became an integration partner with Toast in 2016, when Toast was exclusively operating as a point-of-sale (POS) company.  At that time, a customer of Gratuity Solutions indicated that they were moving to Toast for their point-of-sale system and wanted to know if Gratuity Solutions' gratuity management and distribution platform could be configured to utilize transaction data from Toast to automate the calculation, allocation, and payout of the customer's tip distribution schedule to its tipped employees.  This resulted in Gratuity Solutions approaching Toast to request access to their transaction data through an

Application Programming Interface (API), which Toast provided. Subsequently and since August 2016, over 700 of Gratuity Solutions' customers ended up being integrated with the Toast POS platform.

46.     Defendant was again reminded of the existence of Plaintiff's patents and their relevance to Plaintiff's software in September of 2021, when general counsel for Plaintiffs, Mr. Carlo Zampogna, sent a letter to Toast highlighting the existence of the Asserted Patents and inviting Toast to return to the negotiating table for further discussions. This letter never received a response.

47.     Toward the end of 2021 and through the first part of 2022, Toast requested Plaintiff, Gratuity Solutions, to update its partner page on the Toast website. Through the partner page questionnaire, Gratuity Solutions again described all of its services and again disclosed the ownership of both of its Patents.

48.     On June 16, 2022, Toast was sent a cease-and-desist letter to the email addresses of General Counsel Brian Elworthy and CEO Chris Comparato notifying them of their infringement and again requesting a response. A week later, on June 23, a Ms. Angela Markle responded, asking for the attachments to the email to be resent. These were sent and acknowledged as received by her. Counsel for Plaintiffs again reached out to Ms. Markle on July 7, where they were told a response to the letter was being prepared. On July 19, Mr. Mark Whitaker of Morrison Foerster sent a letter to counsel for Plaintiffs disputing their infringement assertions and the sufficiency of the notice, alleging that claim charts would be necessary for Toast to determine if Toast Tips Manager Infringed.

49.     Upon information and belief, since Toast had knowledge of the '050 patent, Toast has induced and continues to induce others to infringe at least claim of the '050 patent under 35

U.S.C. § 271(b) by, among other things, and with specific intent or willful blindness, actively

aiding and abetting others to infringe, including but not limited to Toast's partners and

customers, whose use of the Accused Instrumentalities constitutes direct infringement of at least

claim 1 of the '050 patent.

50.    In particular, Toast's actions that aid and abet others such as their partners and

customers to infringe include distributing the Accused Instrumentalities and providing materials

and/or services related to the Accused Instrumentalities.  On information and belief, Toast has

engaged in such actions with specific intent to cause infringement or with willful blindness to the

resulting infringement because Toast has had actual knowledge of the '050 patent and that its

acts were inducing infringement of the '050 patent since Toast has had knowledge of the '050

patent.

51.    In particular, Toast provides detailed instructions on how to use and marketing

materials encouraging the use of its infringing software and systems to its customers,

competitors, and the general public through its website.

52.    The "Toast Tips Manager Guide" (available at

https://central.toasttab.com/s/article/Toast-Tips-Manager-Guide, last accessed September 19,

2022) offers detailed instructions on how to use the infringing system.

53.    Upon information and belief, since Toast had knowledge of the '050 patent,

Defendant is liable as a contributory infringer of the '050 patent under 35 U.S.C. § 271(c) by

offering to sell, selling and importing into the United States gratuity management technology to

be especially made or adapted for use in an infringement of the '050 patent.  The Accused

Instrumentalities are material components for use in practicing the '050 patent and are

specifically made and are not a staple article of commerce suitable for substantial non-infringing use.

54.      On information and belief, since Toast had knowledge of the '050 patent, Toast's infringement has been and continues to be willful.

55.      GS has been harmed by the Toast's infringing activities.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 10,726,436

56. The allegations set forth in the foregoing paragraphs 1 through 55 are incorporated into this Second Claim for Relief.

57.      On July 28, 2020, the '436 patent was duly and legally issued by the United States Patent and Trademark Office under the title "System and Method for Managing Gratuities"

58.      GS is the assignee and owner of the right, title and interest in and to the '436 patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

59.      Upon information and belief, Toast has and continues to directly infringe one or more claims of the '436 patent by selling, offering to sell, making, using, and/or providing and causing to be used products, specifically including the Toast Tips Manager which by way of example includes the products described at this URL https://central.toasttab.com/s/article/Toast-Tips-Manager-Guide (last accessed September 19, 2022) (the "Accused Instrumentality").

60.      Upon information and belief, the Accused Instrumentality performs a method for managing gratuity allocations.

61.      Exemplary infringement analysis showing infringement of claim 1 of the '436 patent is set forth in Exhibit 6.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Toast with respect to the '436 patent.  GS reserves all rights to amend, supplement and modify this preliminary infringement analysis.

Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '436 patent.

62.     The Accused Instrumentality infringed and continues to infringe at least claim 1 of the '436 patent during the pendency of the '436 patent.

63.     On information and belief, Defendant has been aware of the existence of Plaintiff's patented invention since at least discussions between Plaintiffs and Defendants in or around January of 2020 regarding the acquisition of Plaintiff's business. During those discussions, an executive summary was furnished to Defendants providing the patent number for the '436 patent and outlining the functions involved in the patented invention, which was and is embodied in Plaintiff's propriety patented software.

64.     Furthermore, Defendant was well acquainted with the operation of Plaintiff's patented software as they advertised Plaintiff's software on their website as an "integration partner" with the Toast platform. Gratuity Solutions became an integration partner with Toast in 2016, when Toast was exclusively operating as a point-of-sale (POS) company. At that time, a customer of Gratuity Solutions indicated that they were moving to Toast for their point-of-sale system and wanted to know if Gratuity Solutions' gratuity management and distribution platform could be configured to utilize transaction data from Toast. This resulted in Gratuity Solutions approaching Toast to request access to their transaction data through an Application Programming Interface (API), which Toast provided. Subsequently, over 700 of Gratuity Solutions' customers ended up being integrated with the Toast POS platform.

65.     Defendant was again reminded of the existence of Plaintiff's patents and their relevance to Plaintiff's software in September of 2021, when general counsel for Plaintiffs, Mr. Carlo Zampogna, sent a letter to Toast highlighting the existence of the Asserted Patents and

inviting Toast to return to the negotiating table for further acquisition discussions. This letter never received a response.

66.     Finally, on June 16, 2022, Toast was sent a cease-and-desist letter to the email addresses of General Counsel Brian Elworthy and CEO Chris Comparato notifying them of their infringement and again requesting a response. A week later, on June 23, a Ms. Angela Markle responded, asking for the attachments to the email to be resent. These were sent and acknowledged as received by her. Counsel for Plaintiffs again reached out to Ms. Markle on July 7, where they were told a response to the letter was being prepared. On July 19, Mr. Mark Whitaker of Morrison Foerster sent a letter to counsel for Plaintiffs disputing their infringement assertions and the sufficiency of the notice, alleging that claim charts would be necessary for Toast to determine if Toast Tips Manager Infringed.

67.     Upon information and belief, since Toast had knowledge of the '436 patent, Toast has induced and continues to induce others to infringe at least claim 1 of the '436 patent under 35 U.S.C. § 271(b) by, among other things, and with specific intent or willful blindness, actively aiding and abetting others to infringe, including but not limited to Toast's partners and customers, whose use of the Accused Instrumentalities constitutes direct infringement of at least claim 1 of the '436 patent.

68.     In particular, Toast's actions that aid and abet others such as their partners and customers to infringe include distributing the Accused Instrumentalities and providing materials and/or services related to the Accused Instrumentalities.  On information and belief, Toast has engaged in such actions with specific intent to cause infringement or with willful blindness to the resulting infringement because Toast has had actual knowledge of the '436 patent and that its

acts were inducing infringement of the '436 patent since Toast has had knowledge of the '436 patent.

69.     In particular, Toast provides detailed instructions on how to use and marketing materials encouraging the use of its infringing software and systems to its customers, competitors, and the general public through its website.

70.     The "Toast Tips Manager Guide" (available at https://central.toasttab.com/s/article/Toast-Tips-Manager-Guide, last accessed September 19, 2022) offers detailed instructions on how to use the infringing system

71.     Upon information and belief, since Toast had knowledge of the '436 patent, Defendant is liable as a contributory infringer of the '436 patent under 35 U.S.C. § 271(c) by offering to sell, selling and importing into the United States gratuity management technology to be especially made or adapted for use in an infringement of the '436 patent.  The Accused Instrumentalities are material components for use in practicing the '436 patent and are specifically made and are not a staple article of commerce suitable for substantial non-infringing use.

72.     On information and belief, since Toast had knowledge of the '436 patent, Toast's infringement has been and continues to be willful.

73.     GS has been harmed by the Toast's infringing activities.

## COUNT III – BREACH OF CONTRACT

74. The allegations set forth in the foregoing paragraphs 1 through 73 are incorporated into this First Claim for Relief.

75.     In 2016, GS became one of the first third-party companies to integrate with Toast, allowing for the sharing of data and enabling GS's software to perform calculations using Toast

Point-of-Sale (POS) data. GS approached Toast about forming a partnership and was asked to sign an NDA ("2016 NDA"). *See* paras 27-31 *supra*. *See* Exhibit 3.

76.      An integration partner on the Toast platform is given access to Toast data through an Application Programming Interface (API) which allows the integration partner's software, in this case GS's, to retrieve and utilize Toast platform data, such as employee time and attendance and transaction/sales information.

77. Toast advertised and continues to advertise its relationship with Gratuity solutions through its website (https://pos.toasttab.com/integrations/gratuity-solutions, last accessed 7/26/2022). Toast states, "Gratuity Solutions streamlines the complicated process of automating the calculation, management and payment of tips and hourly wages for front of house & back of house employees, through seamless direct API integrations between your time clock, Toast transactions, payment methods, and payroll reporting platforms." This description is accompanied by the illustration below:



*See, e.g.* https://pos.toasttab.com/integrations/gratuity-solutions (last visited July 27, 2022)

78.     In or around November of 2019, Toast was approached by David Levine of Corum Group Limited, a business brokerage. Mr. Levine approached Toast on behalf of Gratuity Solutions to determine if Toast would be interested in acquiring GS.

79.     Toast expressed interest in acquiring GS and again drafted a Mutual Non-Disclosure Agreement ("2019 NDA"), which was signed by General Counsel for Toast. *See* Exhibit 4.

80.     The 2019 NDA defines "Proprietary Information" in Section 1 as follows:

***Proprietary Information***: means all trade secrets and any information disclosed by the Disclosing Party to the Recipient either directly or indirectly, in writing, orally, electronically or by inspection of tangible objects (including without limitation documents, prototypes, samples, plant and equipment, software, technical documentation and pricing), whether or not marked or designated as "Confidential," "Proprietary" or some similar designation. Proprietary Information includes, without limitation:

(a) all information concerning the Disclosing Party and its affiliates', and their customers', suppliers' and other third parties' past, present and future business affairs including, without limitation, finances, customer information, supplier information, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies;

(b) the Disclosing Party's trade secrets, know-how, unpublished patent applications, unpatented inventions, ideas, methods and discoveries, and other confidential intellectual property;

(c) the Disclosing Party's designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing;

(d) any third-party confidential information included with, or incorporated in, any information provided by the Disclosing Party to the Recipient or its Representatives;

(e) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials prepared by or for the Recipient or its Representatives that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the information described in this definition; and

(f) the existence or status of, and any information concerning, the discussions between the parties concerning the possible establishment of a business relationship.

81.     Section 2 goes on to define the purpose of the 2019 NDA as follows:

**Purpose.** The parties intend to engage in discussions and negotiations concerning the possible establishment of a business relationship between them. In the course of such discussions and negotiations and in the course of any such business relationship, it is anticipated that each party will disclose or deliver to the other party and to such party's Representatives certain of its Proprietary Information for the purposes of enabling the other party to evaluate the feasibility of such business relationship and to perform its obligations and exercise its rights under any such business relationship that is agreed to between the parties (the "Purposes"). The parties are entering into this Agreement in order to assure the confidentiality of such Proprietary Information in accordance with the terms of this Agreement. This Agreement shall not be construed in any manner to be an obligation to enter into any definitive agreement or to result in any claim whatsoever by one party against the other for reimbursement of costs for any efforts expended with respect to the proposed business relationship.

82.     Section 4 of the 2019 NDA, entitled "Use and Disclosure of Proprietary

Information," states as follows:

"The Recipient and its Representatives shall use the Disclosing Party's Proprietary

Information only for the Purposes and such Proprietary Information shall not be used for

any other purpose without the Disclosing party's prior written consent. The Recipient and

its Representatives shall:

    (a)     protect and safeguard the confidentiality of all such Proprietary

            Information with at least the same degree of care as the Recipient would

            protect its own Proprietary Information, but under no circumstances less

            than a reasonable degree of care;

    (b)     not use the Disclosing Party's Proprietary Information in any manner to

            the Disclosing Party's detriment, including without limitation, to reverse

engineer, disassemble, decompile or design around the Disclosing Party's

proprietary services, products and/or intellectual property; and

(c)    not disclose any such Proprietary Information to any person or entity other

than the Recipient's Representatives who: (i) need to know the Proprietary

Information to assist the Recipient, or act on its behalf, in relation to the

Purposes or to exercise its rights under this Agreement; (ii) are informed

by the Recipient of the confidential nature of the Proprietary Information;

and (iii) are subject to confidentiality duties or obligations to the Recipient

that are no less restrictive than the terms and conditions of this Agreement.

83.    Upon information and belief, Toast has breached the terms of the 2016 NDA and the 2019 NDA by disclosing or causing to be disclosed through its website and/or other potential means proprietary information revealed to it by GS, including through the design, implementation, and instructions for use of the Toast Tips Manager.

84.    Furthermore, upon information and belief, Toast has used the proprietary information disclosed to it by GS to GS's detriment, including by reverse engineering GS's software, disassembling GS's proprietary system, decompiling GS's proprietary code, and/or by utilizing the proprietary information to design around GS's proprietary products and services.

85.    On information and belief, since Toast had knowledge of the 2016 NDA and the 2019 NDA and their public disclosure, Toast's breach of the NDA has been knowing and willful.

86.    GS has been harmed by Toast's breaching activities.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, GS demands a trial by jury on all issues triable as such.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment for itself and against Toast as follows:

A.      An adjudication that Toast has infringed the '050 patent;

B.      An adjudication that Toast has infringed the '436 patent;

C.      An adjudication that Toast has breached the terms of the 2016 NDA and the 2019 NDA;

D.      An award of damages to be paid by Toast adequate to compensate GS for Toast's past infringement of the '050 and '436 patents, as well as Toast's breach of the NDA, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

E.      A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of GS's reasonable attorneys' fees; and

F.      An award to GS of such further relief at law or in equity as the Court deems just and proper.


Dated: September 19, 2022                    ARROWOOD LLP


                                             /s/ Raymond P. Ausrotas
                                             Raymond P. Ausrotas (BBO #640315)
                                             RAusrotas@arrowoodllp.com
                                             William F. McGonigle (BBO #569490)
                                             wmcgonigle@arrowoodllp.com
                                             ARROWOOD LLP
                                             10 Post Office Square, 7th Floor South
                                             Boston, MA  02109
                                             T: 617-849-6200

                                             *Attorneys for Plaintiffs* Gratuity Solutions, LLC and
                                             Gratuity, LLC